Mary COLEMAN, Plaintiff,

v.

DANEK MEDICAL, INC.,
et al., Defendants.

No. CIV.A. 3:96CV776LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

April 30, 1998.

Stanton E. Shuler, Jr., Leake & Anderson, L.L.P., New Orleans, LA, for Plaintiff.

Neville H. Boschert, John Chase Bryan, Watkins, Ludlam, Winter & Stennis, P.A., Jackson, MS, Fred Krutz, III, Daniel J. Mulholland, Foreman, Perry, Watkins, Krutz & Tardy, Jackson, MS, Kambiz Thomas Shahriari, Mitchell A. Stearn, Porter, Wright, Morris & Arthur, Washington, DC, Janet L. MacDonell, William Lee Kohler, Joseph Lee McReynolds,

Douglas R. Elliott. Deutsch, Kerrigan & Stiles, New Orleans, LA, for Defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

This case is one of more than two thousand separate products liability actions filed in this country by more than five thousand plaintiffs claiming that defective "pedicle screw fixation devices" which have been surgically attached to the pedicles of their spines have caused them to suffer physical injuries. Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation transferred these cases to the United States District Court for the Eastern District of Pennsylvania for consolidated pretrial proceedings, following which two separate groups of plaintiffs filed consolidated "Omni Actions." Generally speaking, the plaintiffs in the first of these two groups, including Mary Coleman, the plaintiff herein, sued not only the manufacturers, designers and distributors of the devices on products liability theories of recovery, but they sued, as well, a number of medical associations, charging that these defendants had unlawfully conspired with the device manufacturers to promote, market and sell pedicle screw fixation devices to medical providers.[1] The MDL court, through Judge Louis C. Bechtle, managed the litigation through extensive procedural matters, including dismissal of the original complaints, the filing of amended omni complaints, discovery, and the resolution of numerous motions, including two motions to dismiss, and that court has recently remanded Coleman's case to this court for final disposition. Her case is now before the court on a motion by defendants the American Academy of Orthopaedic Surgeons, the North American Spine Society, and the Scoliosis Research Society (collectively, the Medical Associations) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has responded in opposition to the motion and the court, having considered the memoranda of authorities submitted by the parties, concludes that the Medical Associations' motion is well taken and should be granted.

In April 1997, Judge Bechtle issued a thorough opinion in *In re Orthopedic Bone Screw Products Liability Litigation*, No. MDL 1014, 1997 WL 186325 (E.D.Pa. April 16, 1997), detailing the plaintiffs' allegations in the consolidated omni actions, describing the pertinent regulatory framework of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, and its Medical Device Amendments, 21 U.S.C. § 360(a) *et seq.*, and ultimately dismissing all but one of plaintiffs' theories of liability against the Medical Associations. In that opinion, the court explained that plaintiffs had alleged "two distinct but overlapping conspiracies," as follows:

> The vertical conspiracy, titled the "Danek Conspiracy," comprises Danek and affiliated spine surgeons and engineers (the "Danek Conspirators"). The horizontal conspiracy, titled the "Intercompany/Association Conspiracy," comprises Danek, other manufacturers, and associations of spine doctors (the "Intercompany/Association Conspirators"). The conspiracies share the same three objectives: (1) causing certain spinal fixation devices to be placed in interstate commerce even though such devices had not received the proper FDA approvals; (2) promoting and marketing such devices for pedicle screw fixation and representing that they were safe and effective for pedicle screw fixation even though the devices were "investigational devices" when intended for such use and even though pedicle screw fixation was an "investigational use" only; and (3) promoting and marketing such devices

---

**1.** The medical associations sued included the defendants herein, including the American Academy of Orthopaedic Surgeons, the North American Spine Society, and the Scoliosis Research Society.

through deceptive and misleading conduct.

1997 WL 186325, at *3 (footnotes and citations omitted).

Plaintiffs alleged that the Danek conspirators agreed to market pedicle screw fixation devices without the necessary FDA approvals, pursuant to a scheme which the court summarized as follows:

> Danek and the conspiring surgeons and engineers signed written contracts whereby Danek agreed to provide them with royalties from the sale of devices, Danek stock, and/or options to purchase Danek stock. FN10. In turn, these surgeons and engineers agreed to participate in seminars at which attending spine surgeons would receive instruction in the use of Danek pedicle screw fixation devices.

> (FN10: Pursuant to the contracts, Danek paid the surgeons and engineers more than $15 million in cash and gave them options to buy more than 245,000 shares of Danek stock.)

> The Danek Conspirators conducted dozens of seminars that falsely made it appear that the surgeons and engineers, as members of the medical profession, were independently educating fellow members of the profession. Consistent with this outward appearance, the surgeons provided instruction to spine surgeons regarding pedicle screw fixation with Danek devices.

> The seminars actually were sales events at which the Danek Conspirators attempted to create or expand a market for the sale of Danek products as pedicle screw fixation devices. Danek representatives staffed sales booths and used the interest in pedicle screw fixation to sell Danek devices. After the seminars, they contacted the attending spine surgeons to sell them Danek devices. Danek also provided brochures, technical manuals, tabletop displays, equipment, sample devices, surgical instruments, and other instructional tools so that the Danek surgeons and engineers could demonstrate techniques of pedicle screw fixation with Danek devices.

> The conspiring surgeons and engineers promoted and marketed pedicle screw fixation devices in furtherance of the conspiracy....

> At the seminars, the surgeons and engineers actively concealed and failed to disclose the financial stake that the spine surgeons and engineers had in the sale of Danek pedicle screw fixation devices, as well as facts concerning the regulatory status and the safety and efficacy of these devices. FN14. By engaging in such deceptive conduct, they acted in conscious disregard of the risk that the acts in furtherance of the conspiracy would result in the distribution of medical devices that were untested and unproven for their intended use and expose Plaintiffs to substantial and serious risks of painful and disabling injuries.

> (FN14: Specifically, the surgeons and engineers concealed the facts that (1) the FDA had consistently refused to approve or clear any pedicle screw fixation device because it had determined that existing data did not provide a reasonable assurance that such devices were safe and effective; (2) ongoing clinical IDE trials failed to provide sufficient, reliable evidence to demonstrate that any device was safe and effective when used for pedicle screw fixation; and (3) the incidence of painful and disabling complications associated with the use of pedicle screw fixation generally and with Danek's particular devices was not established by valid scientific evidence.)

*Id.* at *5–6 (footnotes and citations omitted). The court went on to describe what it termed the "Intercompany/Association Conspiracy"—which is the "conspiracy" charge that is the subject of the present motion—as follows:

> The manufacturers provided the professional associations with money to

sponsor or conduct seminars that were directed to spine surgeons and that promoted pedicle screw fixation surgery. These seminars were very similar to those described in the Danek Conspiracy as "sales events," with the sellers and manufacturers funding the seminar, recruiting doctors with financial interests in the sales of Danek devices to provide instruction, setting up sales booths, distributing brochures and similar literature, demonstrating how to use the Danek devices, and making follow-up solicitations to purchase Danek devices from surgeons who attended the seminars. The Intercompany/Association Conspirators actively concealed the same facts as the Danek Conspirators. Thus, they acted in reckless disregard for the risk that the conspiracy and the acts taken in furtherance thereof would result in the distribution of investigational, experimental devices, which otherwise would not reach the market and that patients receiving such devices would suffer severe, disabling, and painful complications. The Intercompany/Association Conspirators conducted and participated in numerous seminars at which they caused the marketing, adulteration, and misbranding of the devices through unlawful, deceptive, and misleading means. (FN 15).

(FN15. Specifically, SRS received about $440,000 from manufacturers or distributors of pedicle screw fixation devices, and conducted at least nine seminars. MASS received more than $600,000 from manufacturers and conducted 11 symposia regarding pedicle screw fixation. AAOS received $815,562 in seminar fees from manufacturers and conducted 13 seminars. AANS received more than $80,000 from manufacturers and conducted 20 seminars. In addition, there were at least 30 other seminars that were not sponsored by SRS, NASS, AASS, and AANS that took place in accordance with the Intercompany/Association Conspiracy.)

*Id.* at *6 (footnotes and citations omitted).

■ After explaining the plaintiffs' allegations, Judge Bechtle, addressing a defense motion to dismiss for failure to state a claim under Rule 12(b)(6), ruled that the plaintiffs "[could] not state a conspiracy claim based solely on the notion that Defendants agreed to violate the FDCA," *id.* at *10, since there is no private right of action under the FDCA, *id.* (citations omitted), and since most, if not all, states "would not recognize a claim for civil conspiracy alleging that the object of the conspiracy was to violate a federal statute that did not provide for a private right of action," *id.* (citations omitted). The court went further, though, observing that plaintiffs had not merely alleged that defendants had agreed to violate the FDCA (which, alone, was not actionable), but had also charged that defendants had "use[d] fraudulent means to achieve their objective," and had thereby stated one viable claim for relief: conspiracy by active concealment of material facts. The court reasoned:

> Most states recognize that an agreement to use unlawful means to achieve the goals of a conspiracy is actionable.... The fraud [claim] alleged in Count II is actionable under the law of most states. The claim alleges ... that Defendants actively concealed material facts at the seminars.... The court finds that th[is] category of fraud sets forth a claim that is actionable under the laws of most states.
>
> As to ... the fraud at the seminars[,] the court believes that this claim is sufficient to satisfy the requirement of causation at this Rule 12(b)(6) stage.
>
> A reasonable jury could infer that material facts were knowingly withheld from doctors who were ignorant of those facts and who attended these seminars. The doctors left the seminars not knowing that some of those who provided instruction at the seminar had a finan-

cial incentive to encourage sales of the devices about which they demonstrated, and that the information at the seminar consequently could likely have been biased or inaccurate. The doctors also were never told that the FDA had not approved the devices and that the safety and efficacy of the devices was unproven. In the dark about these important facts, the doctors relying on the presentations, in whole or in part, counseled their patients about the benefits and risks of pedicle screw fixation devices, as they understood them. Their patients, in turn, claim to have ultimately agreed to the implanting of the device in their spine, which caused injury.

*Id.* at *10–11 (citations omitted). Thus, in this case, the only conspiracy claim which remains following the MDL court's ruling on the motion to dismiss is plaintiff's Intercompany/Association conspiracy claim of an "agreement to promote a Class III device without FDA approval by unlawful means (actively concealing material facts at the association-sponsored seminars/sales events)." *Id.* at *11.[2]

This claim (common law conspiracy to defraud by active concealment), which is the sole claim to have survived defendants' motion to dismiss in the MDL court, is now the subject of the Medical Associations' motion for summary judgment. In support of that motion, the movant defendants submit that there was no fraud by active concealment, since (1) the FDA status of bone screw labeling, i.e., the lack of FDA labeling clearance for pedicle screw fixation devices, was irrelevant to whether a particular use of such a device constitutes safe and effective medical treatment; (2) the existence of financial relationships between the Medical Associations, seminar speakers and bone screw manufacturers was likewise immaterial; (3) there was no intent to defraud anyone; and (4) plaintiff cannot prove reliance or causation, essential elements of her claim for relief.

■ Defendants' argument that there can be no actionable claim for fraud for their alleged failure to disclose to seminar attendees that the FDA had not approved (and/or had consistently declined to approve) pedicle screw fixation devices is based largely, if not wholly, on their contention that the practice of medicine is exempt from the FDCA so that "off-label" uses of devices in the "practice of medicine" do not violate the FDCA. *See* FDA Modernization Act of 1997, 21 U.S.C. § 396 (codifying existing principle that "[n]othing in this Act shall be construed to limit or

**2.** In a footnote in her opposition memoranda, plaintiff says that she "disputes the Medical Associations' statement that Judge Bechtle 'dismissed all but one aspect of [plaintiff's conspiracy] claim." It is manifest, however, that this is precisely what Judge Bechtle did. He did further observe that he was denying the defendants' motion as to plaintiff's active concealment claim *without prejudice so that* defendants might seek reconsideration once the case was remanded to the transferor court based on the failure to state a claim under the state law that governs each separate civil action. However, his opinion in no way suggests that he contemplated that a dissatisfied plaintiff *might seek reconsideration* in the transferor court of that part of his ruling granting defendants' motion to dismiss. The plain fact is, Judge Bechtle did dismiss plaintiff's claim based on a conspiracy to promote the subject devices without FDA approval and that is no longer a claim in the case. In any event, while plaintiff now claims that "Mississippi law recognizes a conspiracy to unlawfully promote pedicle screw fixation devices without FDA approval in and of itself," she has offered no authority for this position and the court is not persuaded that her position in this regard is correct, or arguably so.

Moreover, for the reasons explained in *Isgett v. Wal–Mart Stores, Inc.,* 976 F.Supp. 422 (S.D.Miss.1997) ("Since the FSHA has been interpreted by this court to provide no private cause of action, an alleged violation of said statute will not provide a basis for a claim of negligence per se."), and *Miller v. E.I. DuPont de Nemours & Co.,* 880 F.Supp. 474 (S.D.Miss.1994) ("[Since Congress did not intend to create a private right of action under FIFRA, then any alleged violation of that statute by defendant cannot provide a basis for a negligence per se claim]."), the court rejects plaintiff's further contention that defendants' alleged agreement to unlawfully promote the device without FDA approval constitutes negligence per se under Mississippi law.

interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship."); *United States v. Algon Chem., Inc.*, 879 F.2d 1154, 1163 (3d Cir. 1989) ("Congress exempted the practice of medicine from the [FDCA] so as not to limit a physician's ability to treat his patients."). The Medical Associations submit that since the medical judgment of the seminar presenters relative to the use of pedicle screw fixation devices was not even covered by the FDCA, then necessarily, the fact that the FDA had not approved the use of the devices in the manner which they proposed could not possibly have been material. This argument, however, overlooks the basic premise of plaintiff's claim, which is that the Medical Associations, in a conspiracy with the device manufacturers, were not practicing medicine at all but were illegally promoting and marketing a device which not only had not received the necessary FDA approval but which the Medical Associations knew were not safe and effective for use in the manner recommended.

In rejecting a similar argument by defendants in their motion to dismiss plaintiffs' complaint based on their claim that their "speech" at the seminars was protected by the First Amendment, Judge Bechtle observed,

> The primary flaw in Defendants' position is that Count II does not characterize the seminars as 'continuing medical education' or the doctors' speech as 'medical opinions.' It calls them 'sales events.' Defendants apparently want the court to overlook the rule requiring the court to accept the allegations in the

Amended Omni Complaints as true. The evidence may ultimately demonstrate that the purpose of the events was medical discussion, and not a sales pitch. In the Rule 12 context, however, the court must view the seminars as sales events and not continuing medical education symposia.

1997 WL 186325, at *16. Though Coleman's case is not before this court in the Rule 12 context, it nevertheless is the case that plaintiff has alleged and undertaken to show, at least circumstantially, that defendants were not engaged in the legitimate expression of medical opinions at these seminars but rather were making sales presentations on behalf of the device manufacturers. The court perceives that there is a genuine dispute between the parties as to the proper characterization of these seminars, whether as sales events or continuing medical education symposia, and consequently, cannot conclude that the FDA status of bone screw labeling was necessarily irrelevant for the reason assigned by the defendant Medical Associations.[3] If these were sales pitches, or the promotion and/or marketing of unapproved medical devices, then the lack of FDA approval may have been relevant.

Defendants insist additionally that any financial relationship between them and the pedicle screw fixation device manufacturers was irrelevant as a matter of law. But in asserting their position on this point, they obviously have attempted to minimize the extent and/or possible significance of their relationships with the manufacturers, noting only that there may have been arrangements for the payment of expenses for seminar speakers, payment of small honoraria and payment for rent for exhibition space at medical conventions.

---

**3.** Defendants submit that there is not one shred of evidence that the presenters at the seminars did not believe every word they said was true, and that it is so utterly irrational and improbable that professional medical associations and eminent physicians would promote products or procedures that they know or should know are harmful, no jury could reasonably conclude that these were sales events rather than legitimate educational seminars. Defendants certainly would seem to have the better of this argument, but this strikes the court more as a jury argument than a basis for concluding that no jury issue exists.

While the court would agree that payment of such expenses as these would not likely be material, the plaintiff suggests the existence of a substantially greater financial link between the Medical Associations and the manufacturers which might well be considered material in the context of a claim for fraud.

■ The court nevertheless concludes that summary judgment is in order, though, because regardless of whether there may have been material nondisclosures (which is an issue that the court need not definitely resolve), in the court's opinion, in the face of defendants' motion, plaintiff has failed to come forward with evidence to show reliance or causation, essential elements of her claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Franklin v. Lovitt Equip, Co.*, 420 So.2d 1370, 1373 (Miss.1982) (setting forth elements of fraud under Mississippi law).

■ With respect to this issue, plaintiff's physician who recommended the use of pedicle screw fixation devices for plaintiff and who actually performed the plaintiff's surgery, Dr. Bruce S. Senter, was twice deposed in connection with this litigation and made it abundantly clear in his testimony that his decision to recommend use of the devices in plaintiff's case was not based on anything he had heard (or not heard) at any seminar but rather was based on his own medical judgment which was, in turn, based primarily on his own personal experience in the use of the devices along with his own personal assessment of what he considered the relevant medical literature and available information relative to the devices.[4] Moreover, while it appears from his testimony that Dr. Senter was unsure when he learned that pedicle screw fixation devices had not secured FDA approval, defendants have presented evidence establishing that he was aware of this fact prior to the plaintiff's surgery in February 1995. And further, while Dr. Senter testified that he was unaware of any financial relationships between the Medical Associations and the device manufacturers, there is nothing in the evidence to suggest that he would have altered his assessment of the medical evidence or would have altered his treatment of plaintiff had he had such information; in fact, his testimony is to the contrary.

In his September 24, 1997 deposition, Dr. Senter explained that following his

4. Plaintiff suggests that she need not prove that Dr. Senter specifically relied on anything that was said or not said at the seminars conducted by defendants since the defendants essentially defrauded the entire spine surgeon community by creating a "standard of care" from their nondisclosures at these seminars. In other words, she has advanced a "fraud on the market" theory of liability, arguing as follows:

That physicians like Dr. Senter believe that pedicle screw fixation is within the accepted standard of care only demonstrates that defendants' conspiracy was successful.

... The Medical Associations willingly and knowingly violated federal law by conspiring with Sofamor Danek, other manufacturers of the pedicle screw fixation devices, and physicians, like Dr. Whitecloud, whom they retained as their agents to create a market pedicle screw fixation by promoting the use of these experimental devices as the purported "standard of care" in spinal fusion surgery.

However, defendants point out, and plaintiff does not dispute, that no court has ever adopted a "fraud on the market" type theory outside the securities fraud context, and the majority of courts which have had occasion to extend the theory to common law fraud cases have expressly declined to do so. *See, e.g., In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 403–04 (6th Cir.1997) (fraud on the market theory not enough to satisfy reliance requirement for common law purposes); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1369 (11th Cir.1997) ("The fraud on the market theory of securities law ... is based on concepts and policies that simply do not apply in a products liability case."). Thus, this court finds that since any fraud which occurred at the seminars visited plaintiff, if at all, through her spine surgeon, then she must prove that her surgeon was defrauded in that he was misled by some fact concealed by defendants at these seminars, was otherwise ignorant of such fact, and that had the fact been disclosed by defendants at the seminars, he would have altered his treatment of plaintiff.

internship and orthopedic residency at the University of Mississippi Medical Center, he did a spine fellowship at Tulane University in 1991 and 1992 in which pedicle screw fixation devices were used extensively—"in about better than 200 cases." And though prior to entering into private practice in 1992, he had not attended any seminars or training courses related to spine fixation using pedicle screws, his experience and training in pedicle fixation was "the reason [he] went into spine surgery," for based on his experience, he felt that "[t]hey were the implant that really brought spine surgery into something that could reliably produce good results." Dr. Senter estimated that in addition to the 200 procedures with the devices he had performed as the primary or assistant surgeon during his fellowship, he had performed another 100 such procedures between the time he entered private practice and the time he performed the plaintiff's surgery.

Dr. Senter further testified that though he had not attended any seminars on the devices before he entered private practice, he did later attend seminars at which pedicle screw fixation was discussed. But he never attended a seminar at which it was represented that pedicle screw fixation was without potential for complications. He explained that he was in any event aware of the risks and complications based on his own experience and exposure to information on the devices from a variety of sources, and that he made his own decision to use these devices based on his own independent medical judgment. During his July 23, 1997 deposition, Dr. Senter testified as follows on this subject:

Q. Do you recall if any of the speakers or presenters ever represented to their audience or to you that the use of these devices was without risk or the potential for complication?

A. No, to the contrary. Most everybody talked about risk complications and pitfalls in the use of devices. in almost any procedure that they present.

Q. Was everything that you heard at these seminars consistent with what you knew about the devices in your private practice and in your personal experience in implanting these devices in patients?

A. That and probably more toward the conservative degree. They were probably—probably more cautious in their use and treatment of patients requiring these devices.

When asked in that deposition if he knew whether any of the presenters at the seminars had a financial interest in the sale of the devices, Dr. Senter said he did not; but when asked whether that information would have affected his decision to use the devices in any of his patients, he responded as follows:

A. No, not the specific use of the device in the patients. I would maybe somewhat suspect their research in that particular paper, but both of these devices that I have used had just a plethora of papers presented about their use and how to use. And there have been some outcome studies, too. So, I mean, no. No specific—specific indication or contraindications to use them on based with any one particular study, no.

Q. Does your decision to use these devices in any of your patients ... depend solely on information that you learned at a seminar?

A. No, I was using these devices long before I went to any meetings of—sponsored by any of these organizations.

Q. All right. Have you ever treated patients based solely on information you received at a seminar?

A. No.

Regarding his knowledge (or lack of knowledge) of the lack of FDA approval, Dr. Senter testified that he did not recall discussion of the FDA status of the devices at any seminars he attended and was not sure when he learned that the devices had not received FDA approval. However, it is undisputed that he attended a meeting in October 1993 at which a paper was

presented regarding the FDA's position on the use of bone screws in the pedicles. And it is absolutely clear that he was aware of this fact at the time of plaintiff's surgery in February 1995, since the patient consent from signed by plaintiff specifically recited the following:

> The placement of these screws has been performed extensively since the mid–1980's, however, at this point the placement of these screws in the vertebral body pedicles has still not been approved by the Food and Drug Administration. The Food and Drug Administration considers pedicle screw fixation experimental.

In light of this evidence, the court perceives no reasonable ground for plaintiff's arguments that there remain genuine issues of material fact as to whether Dr. Senter's knowledge of financial relationships with the manufacturers would have influenced his treatment decision in plaintiff's case; that Dr. Senter was unaware of the FDA status of the devices; that he did not know that there was no valid scientific evidence of the safety and efficacy of pedicle screw fixation devices; and that he did not know that the safety and efficacy of the devices had not been successfully demonstrated to the FDA's satisfaction. It is plainly the case that Dr. Senter based his treatment decision not on what he learned at any seminar but on his own extensive experience and readings on the subject; that he was aware that the FDA had not approved the devices for the uses to which he put them; and that there were risks attending their use. And though he was not specifically aware of any financial ties between the Medical Associations and the device manufacturers, there is no proof at all that such knowledge would have affected his treatment decision. *cf. Theriot v. Danek Medical, Inc.*, No. 94–2646 (E.D.La. Dec. 5, 1997) (summary judgment entered on plaintiff's claim against manufacturer due to plaintiff's failure to submit evidence to support contention that treating physician was unaware of potential risks or that he would have discontinued use of pedicle back screws had he been warned of the risks).

For the foregoing reasons, the court concludes, and it is ordered, that the defendant Medical Associations' motion for summary judgment is granted.[5]

---

5. Plaintiff has argued that defendants' motion was filed prematurely because discovery is not complete as to these defendants' participation in the alleged conspiracy to unlawfully promote pedicle screw fixation devices. However, as defendants aptly note, in view of Dr. Senter's testimony, no amount of additional discovery will change the fact that Dr. Senter was not defrauded.