**Shirley BAKER, Plaintiff.**

v.

**DANEK MEDICAL, et al., Defendants.**

**Nos. GCA 95CV10033 MMP, GCA 95CV10154 MMP.**

United States District Court, N.D. Florida, Gainesville Division.

Aug. 5, 1998.

Thomas J. Kliebert, Jr., Kliebert & Heltz PC, Gramercy, LA, for Shirley A. Baker, plaintiff.

Stephen B. Gallagher, Victor M. Halbach, William M. Corley, M. Scott Thomas, Marks, Gray, Conroy, J. Richard Moore, Moore, Smith & Moore, Jacksonville, FL, Mitchell A. Stearn, K. Thomas Shahriari, Porter, Wright, Morris, Washington, DC, Edwin S. Gault, Jr., Roland M. Slover, Fred Krutz, III, Daniel J. Mulholland, David H. Fulcher, Forman, Perry, Watkins, Jackson, MS, Janet L. MacDonell, W. Lee Kohler, Joseph L. McReynolds, Douglas R. Elliott, Deutsch, Kerrigan & Stiles LLP, New Orleans, LA, James Craig Corbett, Fisher, Rushmer, Werrenrath, Orlando, FL, Daniel J. Santaniello, Daniel J. Santaniello PA, Daniel J. Koleos, Luks, Koleos & Santaniello, Fort Lauderdale, FL, Rutledge, Richardson, Liles, Liles, Gavin & Costantino, Raymond Scott Costantino, Liles, Gavin & Costantino, Jacksonville, FL, Robert O. Stripling, Stripling, McMichael & Stripling PA, Gainesville, Constance Daniels, Constance Daniels PA, Tampa, FL, Charles R. Daniels, II, Stanton Shuler, Jr., Leake & Andersson LLP, New Orleans, LA, Richard J. Suarez, Hardeman & Suarez, Miami, FL, William S. Daskam, IV, Butler, Burnette & Pappas, John W. Weihmuller, Butler, Burnette & Pappas, Tampa, FL, Robert Reeder, Thomas R. Harrington, Elizabeth J. Chambers, Cozen & O'Connor, Philadelphia, PA, Gordon James, III, Heinrich, Gordon, Hargrove, Fort Lauderdale, FL, Cathy J. Goodwin, Heinrich, Gordon, Hargrove, Orlando, FL, Thomas G. Stayton, Baker & Daniels, Indianapolis, IN, Albert J. Dahm, Baker & Daniels, Fort Wayne, IN, Susan S. Wettle, Ann E. Eberle, Brown, Todd & Heyburn PLLC, Louisville, KY, for defendants.

## *ORDER*

PAUL, Senior District Judge.

This matter is before the Court on the following motions, following remand of this case from the MDL court:

(1) the Medical Associations' motion for summary judgment (doc. 60);

(2) Zimmer, Inc.'s motion for summary judgment (doc. 69);

(3) Warsaw Orthopedic, I., Sofamor, S.N.C., Sofamor–Danek Group, Sofamor, Inc., Danek Medical, Inc.'s motion for summary judgment (doc. 71);

(4) Richard Ashman, Ph.D., John A. Herring, M.D., Charles E. Johnston, II, M.D., Gary Lowery, M.D., Ph.D., George Rapp, M.D., Ensor E. Transfeldt, M.D., Thomas Whitecloud, III, M.D., Thomas A. Zdeblick, M.D., and Texas Scottish Rite Hospital for Children's motion to dismiss for lack of personal jurisdiction and motion for summary judgment (doc. 74);

(5) Youngwood Medical's motion for summary judgment (doc. 64);

(6) Synthes, USA, Synthes, Inc., and Synthes North America's motion for summary judgment (doc. 70);

(7) DePuy–Motech, Inc.'s motion for summary judgment (doc. 76);

(8) Cross Medical Products Inc.'s motion for summary judgment (doc. 63);

(9) Smith & Nephew Richards, Inc.'s motion for summary judgment (doc. 67);

(10) Spinal Science's Motion for Summary Judgment (doc. 72);

(11) Richard Treharne and Ermon Pickard's Motion for Summary Judgment (doc. 73); and

(12) Advanced Spine Fixation Systems, Inc.'s motion to dismiss for lack of personal jurisdiction (doc. 66).

The plaintiff has responded to all of these motions, and both parties have filed voluminous documentation supporting their positions. This matter is now ripe for disposition.

## A. Background

This case is one of more than two thousand separate products liability actions filed by more than five thousand plaintiffs claiming that defective "pedicle screw fixation devices" which have been surgically attached to the pedicles of their spine have caused them to suffer physical injuries.[1] Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation transferred these cases to the United States District Court for the Eastern District of Pennsylvania for consolidated pretrial proceedings, following which two separate groups of plaintiffs filed consolidated "Omni Actions." Generally speaking, the group of plaintiffs including Ms. Baker sued not only the manufacturers, designers and distributors of the devices on products liability theories of recovery, but they sued, as well, a number of medical associations, charging that these defendants had unlawfully conspired with the device manufacturers to promote, market and sell pedicle screw fixation devices to medical providers.

The MDL court, through Judge Louis C. Bechtle, managed the litigation through extensive procedural matters, including dismissal of the original complaints, the filing of "Amended Omni Complaints", discovery, and the resolution of numerous motions. Notably, in December 1996, defendants filed motions to dismiss the Amended Omni Complaints. The motions were granted to the extent that they sought dismissal of the conspiracy and concert of action claims based on fraudulent submissions to the FDA. The motions were denied with prejudice to the extent that they were based on improper pleading and the First Amendment. The motions were denied without prejudice to the extent that they were based on state conspiracy law. *See In re Orthopedic Bone screw Products Liability Litigation,* MDL 1014, 1997 WL 186325 (E.D.Pa. April 16, 1997). Defendants petitioned the United States Court of Appeals for the Third Circuit for mandamus relief from the rulings concerning the First Amendment and state conspiracy law. The Third Circuit denied mandamus relief on both Issues. *See In re Orthopedic Bone Screw Products Liab. Lit.,* No. 97–1426 (3d Cir.Sept. 23, 1997). Additionally, the MDL court granted partial summary judgment on all claims based upon fraud on the FDA. The Court concluded that no implied private right

1. In December 1993, the ABC News program $^{20}/_{20}$ featured a story on the screws and their use in the pedicle of the spine. After that broadcast, thousands of people who had undergone spinal fusion surgery involving pedicle screws filed suit against pedicle screw manufacturers.

of action existed for violations of FDA regulations because the FDA alone has exclusive prosecutorial discretion regarding such violations. Finally, in *In re Orthopedic Bone Screw Products Liability Litigation*, 176 F.R.D. 158 (E.D.Pa.1997), the MDL court approved a $100 million settlement releasing all claims against AcroMed.

## B. Plaintiffs' Conspiracy Claim

The following review of the factual allegations of plaintiff's complaint is taken from the MDL court's order in this case dismissing the conspiracy and concert of action claims based on allegedly fraudulent submissions to the FDA. *In re Orthopedic Bone screw Products Liability Litigation*, MDL 1014, 1997 WL 186325 (E.D.Pa. April 16, 1997). In Count II of the Amended Omni Complaints, Plaintiffs allege two distinct but overlapping conspiracies. The vertical conspiracy, titled the "Danek Conspiracy," comprises Danek and affiliated spine surgeons and engineers (the "Danek Conspirators").[2] (*Amended Complaint* ¶ 130.) The horizontal conspiracy, titled the "Intercompany/Association Conspiracy," comprises Danek, other manufacturers,[3] and associations of spine doctors (the "Intercompany/Association Conspirators").[4] *Id.* ¶¶ 204, 206–10. According to the complaint, the conspiracies share the same three objectives: (1) causing certain spinal fixation devices to be placed in interstate commerce even though such devices had not received the proper FDA approvals; (2) promoting and marketing such devices for pedicle screw fixation and representing that they were safe and effective for pedicle screw fixation even though the devices were "investigational devices" when intended for such use and even though pedicle screw fixation was an "investigational use" only; and (3) promoting and marketing such devices through deceptive and misleading conduct. *Id.* ¶¶ 131, 205.

## 1. The Regulatory Framework

Because the conspiracies allegedly have the objective of unlawfully promoting and marketing pedicle screw fixation devices in violation of federal law, it is necessary to summarize the regulatory framework regarding such devices.

■ The FDA regulates the devices at issue in this litigation under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, and its Medical Device Amendments, 21 U.S.C. § 360(a) *et seq.*, and regulations promulgated thereunder. The statute defines "device" as any article "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals...." 21 U.S.C. § 321(h). As this definition implies, whether an article is considered to be a regulated "device" under the FDCA depends on the article's "intended use." The intended use of a product may be derived from the manner in which the product is characterized in the marketplace—through labeling, marketing, advertising, and the like—by the product's vendor. *See* 21 C.F.R. § 801.4; *United States v. Articles of Drug for Veterinary Use*, 50 F.3d 497, 500 (8th Cir.1995). The FDA has classified the bone screw devices that are intended to achieve a fusion in the pedicle of the lumbar spine as "Class III" devices because they "present[ ] a potential unreasonable risk of illness or injury."[5] 21 U.S.C.

---

**2.** The named surgeons and engineers are Eduardo Luque, Charles E. Johnston II, Richard Ashman, Gary Lowery, George Rapp, Ensor Transfeldt, John A. Herring, Thomas Whitecloud III, and Thomas A. Zdeblick.

**3.** The other manufacturers alleged to have joined this conspiracy are Sofamor–Danek Group, Inc., Stuart Medical Inc., AcroMed Corporation and related companies, Ace Medical Company, ASFSI, Cross Medical Products, Inc., DePuy–Motech, Inc., Scientific Spinal, Inc., Smith & Nephew Richards, Inc., Sofamor, S.N.C., Synthes, Inc., and related companies, and Zimmer, Inc. ("Zimmer").

**4.** The associations that are alleged to have joined this conspiracy are AANS, AAOS, NASS, SRS, and the Spinal Science Advancement Foundation ("SSAF").

**5.** In comparison, Class I devices pose little or no threat to public health and safety, such as nonprescription sunglasses, tongue depressors, canes, and elastic bandages. 21 C.F.R. §§ 880.5075, 880.6230, 886.5850, 890.3075. Class II devices pose a greater risk to health, such as tampons and syringes. 21 C.F.R. §§ 880.5570, 884.5470.

§ 360c(a)(1)(C)(ii)(II). Class III devices generally require "pre-market approval" before they may be commercially distributed or sold. 21 U.S.C. §§ 360c(a)(1)(C), 360e. The FDA must deny pre-market approval, among other reasons, if there is a "lack of a showing of reasonable assurance" that the device is safe and effective "under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 360e(d)(2)(A),(B). A demonstration of safety and efficacy sufficient to warrant marketing approval of a drug or device requires evidence from "well-controlled" clinical investigations conducted in accordance with generally accepted principles of epidemiology that minimize the risk of bias, confounding, or random error that would produce erroneous outcomes. 21 U.S.C. §§ 360e & 355(d); 21 C.F.R. §§ 814.20, 130.12.

A manufacturer may generate the scientific data necessary to obtain pre-market approval for a Class III device under the FDCA's Investigational Device Exemption ("IDE") provisions. 21 U.S.C. § 360j(g); 21 C.F.R. part 812. Under these sections, the experimental devices may be used in clinical trials without pre-market approval under stringent conditions established and actively supervised by the FDA.[6] 21 U.S.C. § 360j(g); 21 C.F.R. part 812.

A Class III device may be commercially marketed and distributed without pre-market approval under several other FDCA provisions. First, a device may be marketed and sold without obtaining pre-market approval if the device was "in commerce" before May 28, 1976, the FDCA's effective date. 21 U.S.C. §§ 360(c)(2)(C), 360c(f)(1); 21 C.F.R. § 807.85(b)(1). Second, a device may be introduced into commerce without pre-market approval if the FDA reclassifies it as a Class I or II device. 21 U.S.C. § 360c(f)(1)(B). To obtain such reclassification, the FDA must determine that "there is reasonable assurance that the device is safe and effective for its conditions of use." 21 C.F.R. § 860.7(c)(1). Third, pre-market approval is not required for a Class III device if the

FDA determines that the device is "substantially equivalent" to a legally marketed "predicate device" in terms of its intended use, technologic characteristics, safety, and effectiveness. 21 U.S.C. §§ 360c(c)(2)(C),(f)(1); 21 C.F.R. § 807.100(b). Because substantial equivalence is governed by Section 510(k) of the FDCA, 21 U.S.C. § 360(k), the FDA's determination of substantial equivalence is called "510(k) clearance." Once 510(k) clearance has been obtained, the device may lawfully be introduced into commerce. 21 C.F.R. § 807.100(a)(1).

The FDCA·provides for civil and criminal penalties for introducing into or receiving in Interstate commerce any adulterated or misbranded device. 21 U.S.C. §§ 331(a),(c), 333. The statute also prohibits the adulteration or misbranding of any device in interstate commerce. 21 U.S.C. § 331(b). A device is "adulterated" if it is a Class III device that has received neither pre-market approval nor 510(k) clearance with respect to the intended use for which it is offered. 21 U.S.C. § 351(f). A device also is "adulterated" if an IDE has been granted, and the sponsor or investigator fails to comply with an FDA requirement. 21 U.S.C. § 351(I). A device is "misbranded" unless its labeling bears adequate directions for its intended use, including "indications, effects ... relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and for the purposes for which it is intended...." 21 U.S.C. § 352(f), 21 C.F.R. § 801.109(c).

## 2. Applications for Approval of Certain Devices

In 1984, AcroMed sought 510(k) clearance to market a pedicle screw fixation system. (*Amended Complaint,* ¶ 72.) Shortly thereafter, Danek sought a similar FDA approval to market their pedicle screw fixation devices. *Id.* The plaintiffs allege that these devices were of questionable efficacy in com-

---

**6.** For example, an IDE clinical trial sponsor or investigator may not promote or test-market a device that is subject to such a trial until the FDA has approved it for commercial distribution, and

may not represent that the investigational device is safe or effective for the purposes for which it is being investigated. 21 C.F.R. § 812.7(a), (d).

parison to existing methodologies of treatment and presented several serious potential risks not posed by existing spine fusion methodologies. *Id.* ¶ 73. The defendants respond that pedicle screw fixation devices are the industry standard and represent the best treatment alternative presently available.

The FDA consistently refused to issue 510(k) clearances for pedicle screw fixation devices. *Id.* ¶¶ 74–75. The FDA approved fourteen separate IDE clinical trials for various pedicle screw fixation devices between 1986 and 1993, but none of them generated sufficient evidence of safety and efficacy to support a successful application for pre-market approval. *Id.* ¶¶ 76–77.

### 3. The Danek Conspiracy

Plaintiffs allege that the Danek conspirators agreed to market Class III pedicle screw fixation devices without the necessary FDA approvals. The Amended Omni Complaints allege that the Danek conspirators agreed to a scheme that can be summarized as follows. Danek and the conspiring surgeons and engineers signed written contracts whereby Danek agreed to provide them with royalties from the sale of devices, Danek stock, and/or options to purchase Danek stock.[7] *Id.* ¶ 134. In turn, these surgeons and engineers agreed to participate in seminars at which attending spine surgeons would receive instruction in the use of Danek pedicle screw fixation devices. *Id.* ¶ 136. According to the plaintiffs, the Danek Con-

spirators conducted dozens of seminars [8] that falsely made it appear that the surgeons and engineers, as members of the medical profession, were independently educating fellow members of the profession. *Id.* ¶ 141. Consistent with this outward appearance, the surgeons provided instruction to spine surgeons regarding pedicle screw fixation with Danek devices. *Id.* ¶¶ 158, 165, 170, 176, 182, 189–89, 193, 197, 201.

The plaintiffs allege that the seminars actually were sales events at which the Danek Conspirators attempted to create or expand a market for the sale of Danek products as pedicle screw fixation devices.[9] *Id.* ¶ 142. Danek representatives staffed sales booths and used the interest in pedicle screw fixation to sell Danek devices. *Id.* ¶ 143. After the seminars, they contacted the attending spine surgeons to sell them Danek devices. *Id.* Danek also provided brochures, technical manuals, tabletop displays, equipment, sample devices, surgical instruments, and other instructional tools so that the Danek surgeons and engineers could demonstrate techniques of pedicle screw fixation with Danek devices.[10] *Id.*

The plaintiffs further allege that at the seminars, the surgeons and engineers actively concealed and failed to disclose the financial stake that the spine surgeons and engineers had in the sale of Danek pedicle screw fixation devices, as well as facts concerning the regulatory status and the safety and

---

**7.** Pursuant to the contracts, Danek paid the surgeons and engineers more than $15 million in cash and gave them options to buy more than 245,000 shares of Danek stock. (*Amended Complaint,* ¶ 149).

**8.** Danek conducted these seminars through the ISF Study Group and SSAF, entities that it formed and funded. (Am.Compl.PP 138–39.)

**9.** Even though the plaintiffs admit that the spine surgeons who attended the seminars did not actually purchase the pedicle screw fixation devices, the Danek Conspirators knew that they controlled the decision as to whether and what extent pedicle screw fixation devices would be purchased for use in spine surgery. Therefore, the plaintiffs argue that Danek viewed these surgeons as their customers. (*Amended Complaint,* ¶ 140.)

**10.** The plaintiffs also allege that the conspiring surgeons and engineers promoted and marketed pedicle screw fixation devices in furtherance of the conspiracy. For example, the plaintiffs point to Drs. Ashman, Herring, Johnston, and Lowery who wrote a book on one pedicle fixation device for use above the sacral vertebrae. (*Amended Complaint,* ¶¶ 159, 166). Dr. Herring also instructed physicians and surgeons regarding pedicle screw fixation with Danek devices as part of a visiting physician program at TSRH. *Id.* ¶ 167. Danek, Luque and Rapp formed the ISF Study Group to promote orthopedic surgical and rehabilitation programs using interpeduncular segmental or other types of fixation. *Id.* ¶ 188. Zdeblick spoke at the Sofamor–Danek sales booth at AAOS meetings, attended Danek's national sales meetings, and participated in Danek "think-tank" meetings in 1993 and 1995. *Id.* ¶ 202.

efficacy of these devices.[11] *Id.* ¶ 145. By engaging in such deceptive conduct, argue the plaintiffs, the defendants acted in conscious disregard of the risk that the acts in furtherance of the conspiracy would result in the distribution of medical devices that were untested and unproven for their intended use and expose Plaintiffs to substantial and serious risks of painful and disabling injuries. *Id.* ¶ 147.

### 4. The Intercompany/Association Conspiracy

The Intercompany/Association Conspiracy is summarized as follows. The manufacturers are alleged to have provided the professional associations with money to sponsor or conduct seminars that were directed to spine surgeons and that promoted pedicle screw fixation surgery. (*Amended Complaint,* ¶ 215.) These seminars were very similar to those described in the Danek Conspiracy as "sales events," with the sellers and manufacturers funding the seminar, recruiting doctors with financial interests in the sales of Danek devices to provide instruction, setting up sales booths, distributing brochures and similar literature, demonstrating how to use the Danek devices, and making follow-up solicitations to purchase Danek devices from surgeons who attended the seminars. *See Id.* ¶¶ 219–20.

The plaintiffs argue that the Intercompany/Association Conspirators actively concealed the same facts as the Danek Conspirators. Thus, according to the complaint, they acted in reckless disregard for the risk that the conspiracy and the acts taken in furtherance thereof would result in the distribution of investigational, experimental devices, which otherwise would not reach the market and that patients receiving such devices would suffer severe, disabling, and painful complications. *Id.* ¶¶ 221–23. Also, the plaintiffs contend that the In tercompany/Association Conspirators conducted and participated in numerous seminars at which they caused the marketing, adulteration, and misbranding of the devices through unlawful, deceptive, and misleading means. *Id.* ¶¶ 224–36. Specifically, SRS received about $440,000 from manufacturers or distributors of pedicle screw fixation devices, and conducted at least nine seminars. (Am. Compl.PP 226–27.) NASS received more than $600,000 from manufacturers and conducted 11 symposia regarding pedicle screw fixation. *Id.* ¶¶ 229–30. AAOS received $815,562 in seminar fees from manufacturers and conducted 13 seminars. *Id.* ¶¶ 231–32. AANS received more than $80,000 from manufacturers and conducted 20 seminars. *Id.* ¶¶ 233–34. In addition, there were at least 30 other seminars that were not sponsored by SRS, NASS, AAOS, and AANS that took place in accordance with the Intercompany/Association Conspiracy. *Id.* ¶ 235.

The plaintiffs then allege that the Intercompany/Association Conspirators then implemented a two-part scheme to avoid liability for their past wrongful acts. *Id.* ¶ 237. First, they established a trade association, the Spinal Implant Manufacturers Group ("SIMG"), to conduct a retrospective cohort study (the "Cohort Study") of pedicle screw fixation in a fraudulent and misleading manner. *Id.* ¶ 238. They agreed to use the results of this deceptive and misleading study to: (1) achieve reclassification of pedicle screw fixation devices so they could be legally marketed without the successful completion of IDE clinical trials and/or pre-market approval; (2) avoid criminal prosecution for illegal sales and distribution of pedicle screw fixation devices; and (3) provide "scientific" evidence for use as part of a defense to litigation in which patients claimed that they suffered harm from using the pedicle screw fixation devices. *Id.* The manner in which the Cohort Study was conducted and reported was, according to plaintiffs, intentionally deceptive and misleading in eleven material

---

11. Specifically, the plaintiffs allege that the surgeons and engineers concealed the facts that (1) the FDA had consistently refused to approve or clear any pedicle screw fixation device because it had determined that existing data did not provide a reasonable assurance that such devices were safe and effective; (2) ongoing clinical IDE trials failed to provide sufficient, reliable evidence to demonstrate that any device was safe and effective when used for pedicle screw fixation; and (3) the incidence of painful and disabling complications associated with the use of pedicle screw fixation generally and with Danek's particular devices was not established by valid scientific evidence. (Am.Compl.P 145(b)(e).)

respects. *Id.* ¶ 240. The results of the Cohort Study were reported to an FDA advisory panel in July 1994, and published in Spine magazine in October 1994. *Id.* ¶ 239.

In the second part of this scheme, Danek, AcroMed, Sofamor, and Zimmer agreed to obtain fraudulent and false documents and testimony purporting to prove that Zimmer had made and sold a commercially available pedicle screw in the United States before May 28, 1976, and submit such material to the FDA to secure 510(k) clearance for a particular Danek device. *Id.* ¶¶ 242–74.

The MDL court found that Plaintiffs' conspiracy claim alleges that Defendants agreed to two conspiracies, each of which had the same single objective: to promote and sell pedicle screw fixation devices in violation of the FDCA. The means in both conspiracles for achieving this objective was the active concealment of material facts from surgeons who attended the seminars and, in the Inter-company/Association Conspiracy only, the false misrepresentations to the FDA regarding the Cohort Study and the documents to obtain 510(k) clearance. Plaintiffs' concert of action claim incorporates by reference the allegations in the conspiracy claim. (*Amended Complaint*, ¶ 278.) The claim is based on the Restatement (Second) of Torts, which states as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself, or gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. Restatement (Second) of Torts § 876 (1979).

## C. Analysis

### 1. The Doctors' and Medical Associations' Motions for Summary Judgment

As an initial matter it is important to clearly define the conspiracy claims which remain viable after Judge Bechtle's order, found at *In re Orthopedic Bone screw Products Liability Litigation,* MDL 1014, 1997 WL 186325 (E.D.Pa. April 16, 1997). In that order, Judge Bechtle addressed two separate types of conspiracy claims. First, the plaintiffs claimed that the defendants harmed the plaintiffs by conspiring to defraud the FDA by submitting false information to the agency. Second, the defendants allegedly defrauded the entire medical community by presenting false, incomplete or misleading information at a series of seminars. Judge Bechtle found that the first theory did not state a cause of action but that the second one did. With regard to the fraud on the FDA theory, Judge Bechtle first recognized that most states did not have a cause of action for pure civil conspiracy. "Civil conspiracy depends on the performance of some underlying tortious act. It is thus not an independent action; it is, rather, a means for establishing vicarious liability for the underlying tort." *Id.* 1997 WL 186325 at *10 (quoting *Griva v. Davison,* 637 A.2d 830, 848 (D.C.Ct.App.1994)). He then concluded that since the FDCA did not provide for a private cause of action, there was no "underlying tort" for the conspirators to have committed. Thus, Judge Bechtle dismissed the complaint "to the extent that it seeks recovery based on Defendants' alleged false statements to the FDA." *Id.* 1997 WL 186325 at *11.

Judge Bechtle noted, however, that he was denying summary judgment without prejudice on the other conspiracy claim (the fraud at the seminars claim) because he had not analyzed that claim under the law of any particular state. He allowed the defendants to bring that issue up again under the law of the particular forum state.

We turn now, therefore, to a consideration of whether the plaintiff has offered sufficient evidence under Florida law (1) that defendants entered into a civil conspiracy "to promote a Class III device without FDA approval by unlawful means (by actively concealing material facts at the association-sponsored seminars/sales events)." *Id.* 1997 WL

186325 at \*12; and (2) that the conspiracy was the proximate legal cause of plaintiff's injuries. It is the second question which destroys plaintiff's case. Plaintiff has not and cannot offer evidence that her spinal surgeon either attended a seminar or was influenced by the representations of any of the defendants when he counseled the plaintiff to use the pedicle screw device.

Plaintiff's spinal fusion surgery took place on December 13, 1990, and was performed by Dr. Fessler, who was extensively deposed in this matter. Dr. Fessler testified in deposition that he simply never attended a single seminar relating to pedicle screws prior to his treatment of the plaintiff. Instead, Dr. Fessler based his decision to use pedicle screws on his personal experimentation, experience, observations and training by doctors not alleged to be involved in the conspiracy.

Dr. Fessler is a board-certified neurosurgeon who specializes in spinal surgery. He has extensive training and experience in pedicle fixation with screws, including on-hands training from an orthopedic surgeon colleague at the University of Florida. He has performed hundreds of instrumented spinal fusion operations, and is well aware of the appropriate risks incumbent with this instrumentation from reading the literature and from learning how to do the procedure with other surgeons not alleged to be co-conspirators. Moreover, Dr. Fessler has conducted independent research regarding the success and complications of spinal instrumentation. In fact, in 1992, he published the results of his research in a peer-reviewed article in the Journal of Neurosurgery entitled "Transpedicular Screw Fixation of the Lumbar Spine, Operative Technique and Outcome in 104 Cases." In short, it is Dr. Fessler's undisputed testimony that he did not rely on any statements, representations or demonstrations by the defendants in deciding to use the pedicle screw devices.

█ Additionally, Dr. Fessler's deposition reveals that he, and most other doctors, are generally not concerned with FDA approval:

> You see, as a physician, I'm under an ethical code to do what I feel is best for my patients, not what the FDA has approved or not approved.

In fact, the FDA Modernization Act of 1997, 21 U.S.C. § 396 specifically codified the existing principle that "nothing in this Act shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for *any condition or disease within a legitimate health care practitioner-patient relationship.*" In other words, if a product is legally marketed for a certain use (pedicle screws are legally marketed for use in a different part of the spine), doctors do not violate the FDCA by prescribing the product for a different use. The doctors must still live up to the standard of care required of doctors, but mere "off-label" use of a product does not violate the FDCA. *United States v. Algon Chemical, Inc.,* 879 F.2d 1154 (3d Cir.1989) ("New uses for drugs are often discovered after FDA approves the package inserts that explain a drug's approved uses. Congress would have created havoc in the practice of medicine had it required physicians to follow the expensive and time-consuming procedure of obtaining FDA approval before putting drugs to new uses.") Case law, Dr. Fessler's testimony and the statute reveal that FDA approval was not a crucial consideration in the minds of doctors, and especially Dr. Fessler, when doctors decide whether to put a certain available medical product to a certain use. Thus, the record is undisputed that Dr. Fessler did not rely upon, and was not persuaded by, the representations or omissions allegedly made by the associations and individual doctors at seminars or elsewhere.

In *Coleman v. Danek Medical, Inc.,* No. 3:96cv776LN, 1998 WL 672702 (S.D. Miss. April 30, 1998), the Court was faced with similar facts:

> [P]laintiff's physician who recommended the use of pedicle screw fixation devices for plaintiff and who actually performed the plaintiff's surgery, Dr. Bruce S. Senter, was twice deposed in connection with this litigation and made it abundantly clear in his testimony that his decision to recommend use of the devices in plaintiff's case was not based on anything he had heard

(or not heard) at any seminar but rather was based on his own medical judgment which was, in turn, based primarily on his own personal experience in the use of the devices along with his own personal assessment of what he considered the relevant medical literature and available information relative to the devices. *Coleman* , 1998 WL 672702 at *11. Based on this testimony, the *Coleman* court concluded even if the doctor did not know about the FDA status of the screws or the alleged financial self-interest of the seminar presenters, "there is no proof at all that such knowledge would have affected his treatment decision." *Id.* 1998 WL 672702 at *16. Consequently, the court found that the plaintiff could not prove reliance, an essential element of fraud under Mississippi law. The same is true in the instant case; plaintiff cannot show that Dr. Fessler relied upon or was influenced by the representations or omissions of the alleged conspiracy.

■ The plaintiff offers a final argument to downplay the fact that Dr. Fessler never attended a seminar before advising plaintiff. Plaintiff argues that the only reason that Dr. Fessler thought pedicle screws were safe in the use in question is because the conspirators had essentially fooled the entire spinal community into believing that pedicle screws were within the industry standard of care. This theory should be rejected in the instant case for two reasons. First, if plaintiff is trying to assert a "fraud on the marketplace" idea to relieve her of the duty of showing actual reliance on the part of the doctor, she faces an uphill climb. No court has ever extended such a theory beyond the securities industry, and, like the *Coleman* Court, this court declines to do so now. Second, if plaintiff is arguing that her doctor based his decision on literature that was tainted by the efforts of the conspirators, her argument should also be rejected. The record is clear that Dr. Fessler received the vast majority of his information, experience and training about pedicle screws through hands-on training from a doctor not alleged to be in the conspiracy and from his own empirical studies of spinal fixation devices. The very title of his published work listed above, "Transpedicular Screw Fixation of the Lumbar Spine, Operative Technique and Outcome in 104 Cases", reveals that he conducted his own empirical study of the success rate of pedicle screw devices. Consequently, plaintiff has not presented any evidence by which a reasonable jury could conclude that Dr. Fessler relied upon any representations of the medical associations and doctors, either directly through seminar attendance, or indirectly, by blindly relying upon the standard of care of a duped spinal surgery community. Instead, the record is clear that Dr. Fessler relied upon his own experience and empirical observations of pedicle screw devices in deciding to use the screws in the care of plaintiff. Accordingly the medical associations and the doctors are entitled to summary judgment on this issue.

**ORDERED AND ADJUDGED:**

(1) the Medical Associations' motion for summary judgment (doc. 60) is GRANTED;

(2) Zimmer, Inc.'s motion for summary judgment (doc. 69) is GRANTED;

(3) Warsaw Orthopedic, I., Sofamor, S.N.C., Sofamor–Danek Group, Sofamor, Inc., Danek Medical, Inc.'s motion for summary judgment (doc. 71) is GRANTED with regard to the conspiracy and concert of action claims. The Court will enter an order on the remaining claims against these defendants by separate order;

(4) Richard Ashman, Ph.D., John A. Herring, M.D., Charles E. Johnston, II, M.D., Gary Lowery, M.D., Ph.D., George Rapp, M.D., Ensor E. Transfeldt, M.D., Thomas Whitecloud, III, M.D., Thomas A. Zdeblick, M.D., and Texas Scottish Rite Hospital for Children's motion to dismiss for lack of personal jurisdiction and motion for summary judgment (doc. 74) is GRANTED;

(5) Youngwood Medical's motion for summary judgment (doc. 64) is GRANTED;

(6) Synthes, USA, Synthes, Inc., and Synthes North America's motion for summary judgment (doc. 70) is GRANTED;

(7) DePuy–Motech, Inc.'s motion for summary judgment (doc. 76) is GRANTED;

(8) Cross Medical Products Inc.'s motion for summary judgment (doc. 63) is GRANTED;

(9) Smith & Nephew Richards, Inc.'s motion for summary judgment (doc. 67) is GRANTED;

(10) Spinal Science's Motion for Summary Judgment (doc. 72) is GRANTED;

(11) Richard Treharne and Ermon Pickard's Motion for Summary Judgment (doc. 73) is GRANTED;

(12) This court will enter a separate order on Advanced Spine Fixation Systems, Inc.'s motion to dismiss for lack of personal jurisdiction (doc. 66) and the Motion to Strike Expert Testimony (doc. 141).

(13) Scoliosis Research, et al.'s Motion for Oral Argument (doc. 61), Smith Nephew's Motion for Oral Argument (doc. 68), and Synthes, Inc.'s Motion for Oral Argument (doc. 78) are DENIED.